IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 28, 2018 Session

## BILL SHANNON WILSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Campbell County**
**No. 17130     E. Shayne Sexton, Judge**

_____

### No. E2018-00299-CCA-R3-PC
_____

The petitioner, Bill Shannon Wilson, appeals the denial of his petition for post-conviction relief, which petition challenged his Campbell County Criminal Court jury convictions of rape of a child. In this appeal, the petitioner reiterates his claim that he was deprived of the effective assistance of counsel and that the cumulative effect of the errors of his counsel, when combined with errors committed by the trial court and this court, deprived him of the right to a fair trial. Because the petitioner has failed to establish that he is entitled to post-conviction relief, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Brennan Wingerter, Knoxville, Tennessee (on appeal), and Jeffrey C. Coller, Jacksboro, Tennessee (at hearing), for the appellant, Bill Shannon Wilson.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Jared R. Effler, District Attorney General; and Thomas E. Barclay, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

A Campbell County Criminal Court jury convicted the petitioner of two counts of rape of a child, and the trial court sentenced the petitioner to 20 years' incarceration.

At the October 2010 trial, the victim, the petitioner's great niece, testified that, on a night when she was 11 years old between the middle of May and the end of June, she was riding a four-wheeler with the petitioner when he drove her down a dirt

path to a lot with a concrete slab "where 'the house used to be.'" *State v. Bill Shannon Wilson*, No. E2013-02551-CCA-R3-CD, slip op. at 2 (Tenn. Crim. App., Knoxville, July 23, 2014). There the petitioner "tied the victim's wrists to the handlebars of the four-wheeler" with two bungee cords, "pulled the victim's jeans and underwear off, and "penetrated the victim's vagina." *Id.* The petitioner then "told the victim that if she said 'anything,' he knew where she lived," which statement the victim "initially thought . . . was a threat[,] but as she thought about it she 'wasn't sure how exactly to take that.'" *Id.* The victim described a second incident, occurring only a few weeks after the first incident, in which the victim was riding in the petitioner's vehicle when he drove her to the same lot as before and "unbuttoned her pants, . . . put his hand down her pants[,] and placed one of his fingers inside of her vagina." *Id.*, slip op. at 3. The victim disclosed the first rape to a friend, Tiffany Hatfield, two years after it occurred, but otherwise did not tell anyone of the rapes until October 2009, when she telephoned a place called "Safe Haven" and reported the incidents. *Id.*

Ms. Hatfield recalled that, when the victim was 13 years old, "the victim told her 'something . . . about her being hurt,'" but Ms. Hatfield did not disclose this information to anyone. *Id.*, slip op. at 4 (alteration in original). "Ms. Hatfield explained that she had been in 'a similar situation' and that, because of th[at] experience, she 'couldn't face [the victim] or her mother.'" *Id.* (second alteration in original).

This court affirmed the convictions on appeal. *Id.*, slip op. at 10.

In his timely-filed petition for post-conviction relief, the petitioner claimed, among other things, that he was deprived of the effective assistance of counsel due to his counsel's failure to fully investigate the case, failure to challenge the specificity of the indictment, and failure to call certain witnesses, including the petitioner. In an amended petition for post-conviction relief filed by post-conviction counsel, the petitioner added claims that his counsel performed deficiently by failing to call a certain witness to impeach the victim's testimony, failing to file certain pre-trial motions, failing to seek "a forensic psychological evaluation and/or psycho-sexual evaluation of [the p]etitioner or victim," failing to seek a bill of particulars, failing to disclose a conflict of interests, failing to object during the State's cross-examination of the defense witness, and failing to communicate a plea offer. The petitioner exhibited to his petition his motion for new trial, exhibited to which was an affidavit from Ms. Hatfield in which she expressed doubts about the truth of the victim's allegations.

At the August 2017 evidentiary hearing, second-chair trial counsel ("co-counsel") testified that he was neither retained nor appointed to represent the petitioner but was instead employed by the petitioner's first-chair trial counsel ("trial counsel") at

the "last minute" to assist at the petitioner's trial. Co-counsel met with the petitioner prior to trial along with trial counsel and the petitioner's family. Co-counsel confirmed that he represented Malea Heneger, later identified as the DCS investigator in the petitioner's case, in her divorce proceedings, which representation was contemporaneous with the petitioner's pretrial and trial proceedings.

Upon questioning by the court, co-counsel agreed that a second-chair attorney is bound by the same ethical standards as a first-chair attorney. He acknowledged that he failed to obtain written consent from the petitioner waiving any conflict of interests, but stated that he informed the petitioner of the conflict "[b]efore trial." Trial counsel informed the petitioner of the risk of the contemporaneous representation of the petitioner and Ms. Henegar and offered the petitioner the option to "get new counsel" or have co-counsel excluded. Co-counsel testified that he did not discuss the petitioner's case with Ms. Henegar, stating, "She wasn't my witness. And right before trial was the only time that I met with [the petitioner], and I didn't even know I was gonna be part of the trial. She wasn't my witness at trial."

The petitioner testified that he retained trial counsel to represent him in this case because the petitioner had only a seventh grade education, could not read or write well, and "didn't have any knowledge of the law." He stated that trial counsel told him that the State had "no evidence" to support the charges against him. Trial counsel appeared on the petitioner's behalf at the preliminary hearing, but the petitioner claimed that trial counsel did "not really" remain in contact with him thereafter. The petitioner said that he met with trial counsel only two or three times before trial, that one of those meetings was the day before trial, and that the only thing that occurred during their final meeting was that trial counsel instructed him to obtain medical records for his wife, Judy Wilson's, 2004 hysterectomy without explaining the significance of the medical records to the case. The petitioner recalled that on one occasion, trial counsel accompanied him to the scene of the alleged rapes, and trial counsel took photographs.

The petitioner averred that trial counsel never discussed a defense strategy with him. The petitioner said that he identified his wife and brother-in-law as potential witnesses, but trial counsel did not call any witnesses on the petitioner's behalf. The petitioner acknowledged that trial counsel talked with Lisa Smith and Patricia Smith before trial, but trial counsel did not call them to testify. The petitioner was unaware of any attempt by trial counsel to interview the State's witnesses. He claimed that Ms. Hatfield attempted to contact trial counsel, but trial counsel never returned her calls. Trial counsel did not cross-examine Ms. Hatfield at trial.

The petitioner testified that trial counsel never discussed with him whether the petitioner would testify or the risks and benefits of doing so. He recalled that "right before trial started," after the judge explained that the petitioner had a right to testify, trial counsel told him to "turn around there and tell the [j]udge you won't be testifying." The petitioner said that he did not know whether he would be called to testify until trial counsel told him that he "won't be testifying." The petitioner stated that trial counsel did not prepare him to testify.

The petitioner said that co-counsel was not present during any pre-trial meetings with trial counsel, but the day before trial, trial counsel told the petitioner that co-counsel "was representing Malea Henegar in a nasty divorce." The petitioner stated that he was unaware at the time that co-counsel would be participating in his trial and that trial counsel did not explain how co-counsel's representation of Ms. Henegar could affect his case. The petitioner claimed that he was not informed that he had the option of obtaining a different lawyer after learning of the conflict of interests. The petitioner never signed a written waiver of the conflict. The petitioner contended that he was unaware that co-counsel was going to participate in his case until co-counsel sat at the defense table at trial. The petitioner said that he "was trying to see what we were gonna do because . . . there had been nothing discussed with [him]," and co-counsel told him "it's your rodeo[;] you can do whatever you want to."

The petitioner asserted that trial counsel never discussed whether the State offered a plea agreement. Trial counsel did not explain to the petitioner the risks and benefits of taking the case to trial, and the petitioner said that he did not understand the risks of going to trial. The petitioner asserted that trial counsel made all of the decisions in the case. As an example, the petitioner stated that, before his sentencing hearing, trial counsel "just told [him] that's what [the sentence] was gonna be." The petitioner said that, other than the one trip to the crime scene, trial counsel conducted no investigation and, as a result, was unprepared for trial. The petitioner stated, "I don't feel like [trial counsel] done the job that he should have done for me far as doing his investigation and . . . talking to the people that he did talk to that could have and would have been witnesses on my behalf . . . ."

On cross-examination, the petitioner stated that, had he known co-counsel would be participating in his case "and had been told certain things there, [he] probably wouldn't have had him" at trial. The petitioner did not recall being questioned about trial counsel's having discussed with him whether or not he would testify. He stated that he did not question trial counsel about the conflict of interests because he "didn't fully understand where he was going on it." The petitioner stated that, during his sentencing

-4-

hearing, he was brought to the courthouse but "sat in the backroom" and was never brought into the courtroom.

The petitioner retained different counsel prior to his motion for new trial hearing. He said that his new counsel did not challenge the indictment and "withdrew . . . the ineffective assistance of counsel" claim from the motion for new trial.

Trial counsel testified that approximately one year passed between the petitioner's retaining him and the trial and that he met with the petitioner "[p]robably about ten" times during that period. Trial counsel said that he met with the petitioner at the petitioner's house "at least three times," and he visited the scene "at least twice." Trial counsel described his pretrial investigation, "I went to the scene. I think there was a four-wheeler involved in this -- had the four-wheeler, talked with [the petitioner], interviewed the witnesses other than the victim, except the victim testified at the preliminary hearing." He acknowledged that he did not conduct a background check on Ms. Hatfield or Ms. Henegar but stated that he had known Ms. Henegar "fairly well" for her whole life because she is the daughter of his first cousin. He stated that he was unaware of anything in Ms. Henegar's life that "could have been used to impeach her credibility." He interviewed the lead detective in the case. He stated that employing a private investigator in this case would not have been beneficial because the alleged incidents occurred eight to 10 years prior to the indictment. Although several witnesses were sworn for the defense at trial, he did not call any witnesses.

Trial counsel conceded that, had he known that Ms. Hatfield believed the victim fabricated the story, he would have attempted to elicit that during cross-examination. He agreed that Ms. Hatfield's statements that the victim's allegations were "suspiciously similar" to her own rape and that she believed the victim had adopted Ms. Hatfield's story as her own would have been helpful to impeach the victim's testimony. He agreed that this case "was a he said, she said case" and that the State's case was based entirely on the credibility of the victim. He also agreed that having a State witness impeach the victim's testimony would have been helpful to the petitioner's defense. He conceded that he was unaware of Ms. Hatfield's potential testimony because he did not interview her prior to trial.

Trial counsel testified that, at the time of the petitioner's trial, he employed co-counsel. He agreed that his office represented the petitioner and Ms. Henegar contemporaneously. Despite having never obtained a written waiver of the conflict of interests from the petitioner and having no recollection of explaining the conflict to the petitioner, trial counsel contended that the petitioner "made an intelligent and voluntary waiver" of the conflict.

Trial counsel did not recall receiving any plea offers from the State but said that if he had received one, he would have communicated it to the petitioner. Trial counsel testified that he discussed with the petitioner the risks of going to trial and explained that, if convicted, the petitioner would be required to serve 100 percent of his sentence. Trial counsel agreed that the petitioner was "a very credible person" and said that if he "made a mistake in representing [the petitioner] in this trial, . . . it was his not testifying." He admitted that the petitioner made the decision not to testify based upon counsel's advice that he not do so, but he said that, in hindsight, he "should have insisted that [the petitioner] testify." Counsel stated that, "[a]t the time, the decision seemed right" because counsel believed that the victim "had jeopardized herself [and] the State's case in her testimony" because she had made "several inconsistent statements." Trial counsel testified that his decision to not put on proof after the court denied his motion for judgment of acquittal was a tactical one.

During cross-examination, trial counsel testified that his pretrial preparation in this case was adequate and that he was fully prepared for trial. He testified that, although he interviewed Detective Hall, he did not ordinarily conduct background checks on law enforcement officers. Although it was trial counsel's practice to tell clients to not worry about their cases, he never promised favorable results. When asked whether the decision to not cross-examine Ms. Hatfield was a strategic one, he replied, "I'm sure that it was." He asserted that, at the time of trial, he did not know that Ms. Hatfield doubted the victim's allegations. Trial counsel testified that he discussed with the petitioner whether the petitioner should testify, and it was the petitioner's decision to not testify. Trial counsel stated that the petitioner "received very effective representation of counsel."

At the conclusion of the hearing, the post-conviction court denied relief, finding that the petitioner had failed to prove by clear and convincing evidence sufficient facts to support a finding that he was deprived of the effective assistance of counsel.

Specifically, the court found that a conflict of interests existed due to trial counsel and co-counsel's contemporaneous representation of the petitioner and Ms. Henegar and that the conflict "was not perfectly disclosed and it was not perfectly perfected, but that rises to the level of an ethical concern not a prejudicial one." The post-conviction court found that the petitioner was not prejudiced by the conflict of interests because the petitioner presented no evidence of anything that either attorney could have used to "question Ms. Henegar's testimony or reliability." The post-conviction court also found that there was "no showing that there was some major objection [by the petitioner to] co-counsel's . . . presence" at trial or that co-counsel's

assisting in the trial "was of some problem." The post-conviction court denied relief on this issue.

The post-conviction court found that, although co-counsel "had very little, if any[thing], to do with the trial preparation[,] . . . there is no showing that . . . had [he] done more that the outcome would be different." The post-conviction court found that the petitioner failed to show prejudice on this issue. The court did not specifically address the adequacy of trial counsel's trial preparation.

The post-conviction court found that the petitioner's credibility was damaged by his statements that the trial court asked before trial whether he would testify and that he was not present during sentencing. The court noted that, contrary to trial counsel and co-counsel's stating that they did not know or did not remember something, the petitioner "answered in ways that simply were incredible or lack[ed] . . . the product of memory." The court accredited trial counsel and co-counsel's testimony over that of the petitioner's and denied post-conviction relief.

In this timely appeal, the petitioner reiterates his claims of ineffective assistance of counsel, alleging specifically that counsel performed deficiently by failing to request a bill of particulars, failing to fully investigate the case, and failing to cross-examine Ms. Hatfield.[1] The State asserts that the post-conviction court did not err by denying relief.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no

---

[1] After the filing of this appeal, our supreme court suspended trial counsel from the practice of law in Tennessee for a period of five years. The petitioner has asked this court to take judicial notice of the order of suspension against trial counsel. Nothing indicates that the disciplinary measure is related to the petitioner's case. The fact that trial counsel was disciplined for his conduct in unrelated matters is irrelevant to the case at hand. Because the supreme court's order of suspension is a post-judicial fact and because an attorney's unethical conduct does not necessarily equate to a constitutional deficiency in representation, we decline to take judicial notice of this matter.

deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

*Ineffective Assistance of Counsel*

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *Kendrick*, 454, S.W.3d at 458 (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

The petitioner first argues that trial counsel performed deficiently by failing to request a bill of particulars, which the petitioner contends would have afforded him "sufficient time to prepare an alibi defense and prevent the prejudicial surprise of learning—for the first time during opening statements—that both of the alleged offenses had occurred in June 2006." Tennessee Rule of Criminal Procedure 7(c) provides that "[o]n a defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charged." Tenn. R. Crim. P. 7(e). "The purpose of the bill of particulars is to provide information about the details of the

-8-

charge when necessary for a defendant to prepare his or her defense, to avoid prejudicial surprise at trial, and to enable the defendant to preserve a plea of double jeopardy." *State v. Speck*, 944 S.W.2d 598, 600 (Tenn. 1997); *see also State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991); *State v. Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000). "Information that may be required in the bill of particulars includes, but is not limited to, details as to the nature, time, date, or location of the offense." *Speck*, 944 S.W.2d at 600 (citing *Byrd*, 820 S.W.2d at 741-42).

The petitioner's indictment provides for two identical counts of child rape occurring sometime between May 2005 and June 2006. At the preliminary hearing, the victim further narrowed the timeframe by testifying that the rapes occurred in May 2006, which testimony generally aligned with her assertion at trial that the rapes occurred after school had let out for the summer but before her 12th birthday on June 30. At the evidentiary hearing, the petitioner presented no evidence as to what additional information the State could have provided in a bill of particulars and failed to ask trial counsel why he did not seek a bill of particulars. Moreover, because the victim's testimony at the preliminary hearing generally aligned with what she provided at trial, the petitioner cannot establish that he was surprised by her trial testimony. Furthermore, trial counsel's accredited testimony established that he was prepared to go to trial, and the petitioner has failed to show how a bill of particulars would have further benefited his defense. Because the petitioner failed to establish what, if any, benefit he could have gained from a bill of particulars, he has failed to show that trial counsel performed deficiently by failing to request a bill of particulars. *See Owens v. State*, 13 S.W.3d 742, 756 (Tenn. Crim. App. 1999) ("For purposes of proving an ineffective assistance of counsel claim, proof of deficient representation by omission requires more than a speculative showing of a lost potential benefit.").

The petitioner next asserts that trial counsel performed deficiently by failing to fully investigate the case prior to trial. We note that the post-conviction court addressed only the petitioner's claim that co-counsel failed to perform an adequate pretrial investigation, finding that co-counsel was not deficient because he had only minimal involvement in the case. Although the court made no specific finding as to the adequacy of counsel's investigation, the post-conviction court accredited trial counsel's testimony that he visited the scene at least twice, investigated the four-wheeler, talked with the petitioner, interviewed some witnesses, and cross-examined the victim at the preliminary hearing. Most importantly, however, the petitioner failed to present at the evidentiary hearing any evidence that counsel could have uncovered with further investigation. Generally, a petitioner fails to establish his claim that counsel did not properly investigate or call a witness if he does not present the witness or evidence to the post-conviction court because a post-conviction court may not speculate "on the question

of . . . what a witness's testimony might have been if introduced" at trial. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

The petitioner also claims that trial counsel performed deficiently by failing to interview the victim prior to trial. Although trial counsel did not interview the victim prior to trial, he did cross-examine her at the preliminary hearing. The petitioner did not present the victim as a witness at the evidentiary hearing; indeed, the petitioner failed to establish that the victim would have agreed to be interviewed prior to trial. Under these circumstances, any conclusion that a pretrial interview would have uncovered information different from that offered by the victim at the preliminary hearing and favorable to the petitioner would be based upon speculation. In consequence, the petitioner has failed to establish that counsel performed deficiently by failing to interview the victim prior to trial.

The petitioner next contends that trial counsel performed deficiently by failing to interview Ms. Hatfield, arguing that, had he done so, he would have learned that Ms. Hatfield doubted the veracity of the victim's claims. In a related claim, the petitioner asserts that trial counsel's performance was deficient because he failed to cross-examine Ms. Hatfield at trial.

The record establishes that, prior to filing his motion for new trial, the petitioner fired trial counsel and hired a new attorney to represent him. That attorney obtained from Ms. Hatfield an affidavit in which Ms. Hatfield expressed doubt about the veracity of the victim's allegations against the petitioner, noting that the victim's allegations were "suspiciously similar" to the details of abuse that Ms. Hatfield had previously revealed to the victim, leading Ms. Hatfield to suspect that the victim had taken Ms. Hatfield's revelation of abuse "and made it her own." Ms. Hatfield also observed that the victim "never appeared frightened or anxious around" the petitioner following the alleged rapes and that Ms. Hatfield, herself a victim of sexual abuse, "never felt uncomfortable around" the petitioner. Although the petitioner exhibited Ms. Hatfield's affidavit to his original pro se petition for post-conviction relief, he did not present it for admission into evidence at the evidentiary hearing. Additionally, although the entire trial record was made an exhibit at the evidentiary hearing, Ms. Hatfield's affidavit was never entered into evidence during any trial proceeding.

That being said, Ms. Hatfield did testify at the motion for new trial hearing, and the transcript of that hearing was admitted as an exhibit at the evidentiary hearing. During her testimony, Ms. Hatfield did not deny making the statements in her affidavit but qualified some of them. Ms. Hatfield testified that she was "a little bit suspicious" when the victim told her about being raped by the petitioner. When asked about her

-10-

affidavit statement that she believed the victim had adopted Ms. Hatfield's story as her own, Ms. Hatfield responded, "I had thoughts of that, yes, but it was just due to problems in our relationship that occurred after the trial." Ms. Hatfield maintained "that she did not have any personal knowledge that the victim had lied about her encounters with the" petitioner. The trial court deemed Ms. Hatfield's testimony "largely speculative regarding the victim's basis of testimony and lack of behavior indicating sexual abuse." *Bill Shannon Wilson*, slip op. at 8. The court also concluded that "[s]uch information, without more, would be inadmissible at trial." *Id.*

To be sure, trial counsel should have at least attempted to interview Ms. Hatfield prior to the petitioner's trial. That being said, the petitioner has failed to establish that he was prejudiced by counsel's omission. Although the fact that Ms. Hatfield had doubts about the veracity of the victim's claims could have been potentially damaging to the victim's credibility, the trial court, who was able to see and hear the witness first hand, found Ms. Hatfield's own credibility to be lacking. Moreover, the trial court, even with the benefit of Ms. Hatfield's live, sworn testimony, concluded that the potential impact of that testimony was not so great as to afford the petitioner a new trial. This court affirmed the trial court's ruling on direct appeal, deferring to the trial court's credibility determination and finding that the trial court did not abuse its discretion by refusing to grant a new trial based upon testimony provided by Ms. Hatfield and a second witness, particularly given that "[a]t the hearing, both of these witnesses denied portions of the affidavits submitted in support of the [petitioner's] claim, discounting what little, if any, basis existed to support a finding that the victim's trial testimony was false." *Id.*, slip op. at 9.

Because Ms. Hatfield did not testify at the evidentiary hearing, we have no basis upon which to revisit the earlier determination that her testimony lacked credibility. Moreover, in the absence of her testimony at the evidentiary hearing, we must presume that she would have revealed to trial counsel no more than she revealed at the hearing on the motion for new trial. Under these circumstances, we cannot say that it is reasonably probable that, had counsel interviewed Ms. Hatfield prior to trial, the result of the proceeding would have been different. Consequently, the petitioner is not entitled to relief on this issue.

*Cumulative Error*

First, we address the stand-alone claims that the trial court erred in the admission of rebuttal evidence and that this court erred in deeming the evidentiary error waived on appeal. The claims are not cognizable in this post-conviction proceeding because they are not of a constitutional timber. Furthermore, were these claims otherwise

-11-

cognizable, we believe the claim relative to the appellate court's error would be deemed waived in this proceeding per the terms of Tennessee Code Annotated section 40-30-105(g) which provides that a "ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented . . . ." T.C.A. § 40-30-106(g). The appellate court error as alleged by the petitioner was clearly cognizable and addressable by this court via a Tennessee Rule of Appellate Procedure 39 petition to rehear, based upon a claim that the court's opinion "overlook[ed] . . . a material fact or proposition of law." Tenn. R. App. P. 39(a). This avenue via appellate rules was not pursued. We note that both the lack of a constitutional deprivation and the issue of procedural default would have been avoided had the petitioner alleged the ineffective assistance of appellate counsel on direct appeal based upon appellate counsel's failure to utilize Rule 39 to correct the appellate court's misstatement. That was not done in this case.

Accordingly, only ineffective assistance of counsel claims remain as possible components of a cumulative error formulation. We are loath to apply a free-standing notion of cumulative error to claims of ineffective assistance of counsel. Instances of ineffective assistance of counsel are deemed to constitute a single rendering of ineffective assistance. *Thompson v. State*, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997) ("Ineffective assistance of counsel is generally "a single ground for relief" under the post-conviction statute." (citing *Cone v. State*, 927 S.W.2d 579, 581-82 (Tenn. Crim. App. 1995))). As such, a petitioner may assert *via post-conviction law*, that an aggregation of instances establish the prejudice prong of *Strickland*. We fail to discern any such aggregation in the present case that would avail the petitioner relief.

Accordingly, we affirm the judgment of the post-conviction court.

_____
JAMES CURWOOD WITT, JR., JUDGE